ELIZABETH A. REYNOLDS v. T. U. McMANUS, Appellant.

**Physicians:** MALPRACTICE: EVIDENCE. In a damage suit for mal-
1 practice the evidence is reviewed and it is held that the question, as to whether the physician exercised proper care and skill in treating a patient injured in confinement by a separation of the pubic bones, is for the jury.

**Same:** NEW TRIAL: EXCESSIVE DAMAGES. It is the duty of a trial
2 court to exercise its best judgment in ruling upon every question presented which is pertinent to the issues, and when convinced that a verdict for damages is grossly excessive it should grant an application for a new trial on that ground. A verdict for $5,000 damages for malpractice in a case of confinement is held under the evidence to indicate passion and prejudice and a new trial is ordered.

*Appeal from Blackhawk District Court.*— HON. FRANKLIN C. PLATT, Judge.

TUESDAY, SEPTEMBER 22, 1908.

ACTION for damages in consequence of alleged malpractice resulted in a verdict and judgment of $5,000. The defendant appeals.

*Courtwright & Arbuckle,* for appellant.

*Mullan & Pickett,* for appellee.

LADD, C. J.— The defendant a physician, attended the plaintiff in confinement November 27, 1904. She was then thirty-seven years of age, of delicate physique, with under-
1. PHYSICIANS: malpractice: evidence.    sized pelvis, and the child her first-born. Instruments were necessarily employed in effecting delivery, in the course of which the symphysis pubes

were ruptured and separated.   This, though unusual, was
not due to any fault of the physician, and the only complaint
is that he was negligent in the treatment of the injury.   Ap-
pellant contends that the evidence was such that this issue
ought not to have been submitted to the jury.   An examina-
tion of the record has convinced us to the contrary, and, with-
out reviewing the evidence in detail, the reasons for this con-
clusion may be stated.   On the third day after confinement,
defendant, by digital examination, ascertained that the pubes
had been separated.   According to his testimony he immedi-
ately undertook treatment by bandaging the patient about
the hips; but, owing to pain, the patient declined to wear the
bandages, and after four applications in as many successive
mornings he concluded to give her no treatment, save requir-
ing her to lie quietly on her back, and when on the side to be
propped up carefully.   This testimony was corroborated by
that of the nurse.   The patient, however, was certain that
no bandages were placed on her, save by the nurse to protect
her form, and these without inconvenience during the first
week, and that defendant did not apply them tightly about
the hips until the third week, and that owing to excessive
pain she was unable to endure them.   She was corroborated
by several witnesses.   No precaution was taken to exclude
the soft parts, as the bladder and urethra, from between the
bones.   Had the separation been no greater than defendant
testified — less than a quarter of an inch — probably nature
would have remedied the difficulty without the aid of band-
ages.   But the doctor was discharged December 24, 1904, and
another physician employed, who testified that upon digital
examination he found a separation of about two inches, and
that this, upon using a speculum, was confirmed.   This phy-
sician placed a sound through the urethra into the bladder
to drag the soft parts away from the pubes, and then brought
them together and held them by the use of adhesive strips
and linen bandages.   That this was proper treatment is not
questioned, though other devices, such as wedging the bones

in position with pads, pillows, or sand bags, or by lying the patient in a swinging hammock, seem to have been approved in usage. If the separation was as great as this physician testified, and the jury might so have found, then there was an abundance of expert testimony that the bones should have been brought together promptly, and that in doing so precaution should have been taken to exclude the soft parts. So that whether the symphysis pubes were so wide apart as to require artificial means in holding them together, whether defendant applied the bandages during the first week, or not until the third week, and whether he exercised proper care to exclude the soft parts from between the bones when drawn together, and whether the bandages could have been worn had he done so, were all issues of fact raised by the evidence, and necessarily presented the sole inquiry as to whether defendant had exercised the degree of care and skill exacted by law in the treatment of the injury. The issue was for the jury.

II. That the plaintiff had not fully recovered at the time of the trial, which occurred a little more than a year subsequent to her confinement, is certain; but, aside from a 2. SAME: new hitch in her walk, none of her difficulties are trial: exces- sive damages. traced by the record to any neglect on the part of defendant. If she suffered from incontinency of urine, this was not shown to have resulted from his treatment. If she could not lift things, or walk far, or tired quickly, her weakness was not proven to have been caused by anything the defendant did. According to the physician who successfully treated her the union of the pubic bones was strong, but not perfect. The disk at the joint had thickened, which caused a kind of side movement, a kind of a little hitch, and had no other effect on the health or bodily strength. No one ventured an opinion that this would be permanent. She was required to continue on her back with the bandages on about a month, but was not shown to have suffered, save from the weariness of her position. The jury might have found that

she was confined to her bed this much longer than she would have been had bandages been properly applied, and that she may not have gotten about as soon after being able to sit up, and possibly the jury also might have allowed for the pain endured when the bandages were unsuccessfullly applied for less than an hour each time, though this is doubtful. These matters furnish the only basis for the verdict and judgment of $5,000 against this defendant. The amount allowed was challenged in the motion for new trial as excessive, but this was denied by the court in overruling the motion. True, the judge declared, in an opinion delivered at the time, that the verdict was "grossly excessive," and seems to have thought that, as the case would come to this court, it was not incumbent on the trial court to pass on the point thus raised, but that it could as well leave the matter for this court to settle. Of course, the ruling on the motion as entered of record is decisive of what was done. Indeed, but for that ruling, the charge that the verdict was excessive could not be made the subject of review; for in actions at law our jurisdiction is limited to the correction of errors. We know of no avenue in the administration of "justice according to law" by which a ruling which is to be reviewed in this court may be successfully evaded by the trial court. The litigant, as well as this court, is entitled, under the law, to its best judgment upon every question pertinent to the issues which may be raised, and only on such ruling can error be assigned. If we should accept the finding of its opinion that the verdict was "grossly excessive," it necessarily follows that the court erred in overruling the motion for new trial. Notwithstanding the difficulties experienced in measuring damages in such a case, it is apparent that the verdict is several times what it should have been under the evidence adduced. Neither party has suggested a remittitur, and we are inclined to regard the amount allowed so excessive as to leave no inference open save that the finding was the result of passion and prejudice.

Because of the error in not awarding a new trial, the judgment is *reversed*.